FILED & ENTERED

JAN 04 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | CHAPTER 7 |
| Mark Alan Shoemaker | Case No.:  1:14-bk-15182-GM<br>Adv. No:   1:14-ap-01206-GM |
| Debtor(s). | **MEMORANDUM OF DECISION AFTER TRIAL** |
| U.S. Trustee | Date:        October 10, 2017<br>Time:        10:00 a.m.<br>Courtroom:  303 |
| Plaintiff(s). | |
| v. | |
| Mark Alan Shoemaker | |
| Defendant(s). | |

Mark Alan Shoemaker ("Debtor," "Defendant," or "Shoemaker") filed a petition for relief under chapter 13 on February 18, 2010.[1]  William Brownstein ("Brownstein") was Shoemaker's attorney of record.  On March 2, 2010, Brownstein filed a motion for extension of time to file schedules, but this was denied on March 3, 2010.  The chapter

---

[1] 2:10-bk-15744-VK

13 case was dismissed on March 15, 2010 for failure to file schedules.

The current chapter 7 case ("Shoemaker Chapter 7 Case"), which is Shoemaker's second bankruptcy case, was filed on May 25, 2010 and again William Brownstein was the attorney of record.[2]  At that time, Shoemaker was a licensed attorney and the principal and sole shareholder of a company called Advocate for Fair Lending ("AFL"), which dealt with people whose homes were in foreclosure.  Because of misconduct on Shoemaker's part, on May 31, 2010 the State Bar of California ordered that he was ineligible to practice law and on March 4, 2011 he was disbarred.[3]

On June 2, 2010, Advocate for Fair Lending filed bankruptcy with Brownstein as counsel.[4]  The initial AFL trustee was Carolyn Dye, but she was replaced on December 13, 2010 by Howard Grobstein.  Trustee Grobstein hired counsel and on March 29, 2011 gave notice of assets and a possible dividend.  However, thereafter AFL trustee Grobstein filed a report of no distribution and the AFL case was closed on December 28, 2011.

Meanwhile, the Shoemaker Chapter 7 Case continued.  On July 6, 2010, the Debtor appeared at the initial §341(a) meeting in the Shoemaker Chapter 7 Case and told Alfred Siegel, the Trustee ("Trustee" or "Siegel"), that there were "well over $4-6 million in accounts and collections actions that were due to Debtor."[5]

On April 8, 2011, the United States Trustee filed this complaint against Shoemaker under 11 U.S.C. § 727 to deny his discharge.[6]

On September 21, 2011, Trustee Siegel filed a report of no distribution. On June

---

[2] The case was initially filed in the Los Angeles division as 2:10-bk-30910-TD and later transferred to the San Fernando Valley division and renumbered 1:14-bk-15182-GM.

[3] State Bar of California webpage: http://members.calbar.ca.gov/fal/Member/Detail/134828.

[4] 2:10-bk-32494-PC

[5] In his trial declaration, Mr. Siegel states that Shoemaker was not aware that there would be any return in the AFL bankruptcy for those creditors.  Although this is not contained in the Trustee's Declaration for Trial (adv. dkt. #268), the "$4-6 million in accounts and collection actions" is stated in his complaint in Siegel v. Brownstein. 1:14-ap-01211-GM at dkt. #1, ¶ 11. As shown by the complaints Siegel filed against former clients of Shoemaker and others, this refers to assertions of assets due to Shoemaker through his law practice and not through AFL.

[6] This adversary complaint was originally filed in the Los Angeles division as 2:11-ap-02011-TD and later transferred to the San Fernando Valley division as 1:14-ap-01206-GM.

20, 2012, Shoemaker filed amended schedules in which he asserted that he had real property assets of $32,500 and personal property assets of $12,290,946.76.[7]  On July 20, 2012 the Trustee withdrew his report of no distribution.[8]

On May 16, 2013, at the request of the Trustee in the Shoemaker Chapter 7 Case, the Court gave notice of possible dividend and set a claims bar date.[9]  Thereafter the Trustee hired counsel and filed a series of collection actions, most of which were dismissed largely on statute of limitations grounds.  Throughout the adversary proceeding against Shoemaker, he has contended that, if the Trustee had acted timely, sufficient funds would have been collected to pay all of his creditors and thus the discharge issue would be moot and this complaint should be dismissed.[10]

Initially the Court stayed prosecution of this complaint to allow the collection actions to go forward.  After the stay was lifted, it struck many of the affirmative defenses pleaded by Shoemaker in his first amended answer.[11]  The also ruled, through a series of motions in limine, that the issue of communications between the Office of the United States Trustee ("UST" or "OUST")[12] and the chapter 7 Trustee are irrelevant.[13] Mr. Shoemaker has stated that he reserves those issues for appeal.

The parties to this adversary proceeding entered into a joint pretrial stipulation, which was accepted by the Court.[14]  (Stipulated facts contained in the Joint Pretrial Stipulation are noted as "JPS" and paragraph number.)  The Court also takes judicial notice of schedules and statements of affairs filed in all of the bankruptcy cases described above.

The Court makes the following findings of fact:

---

[7] BK Dkt. #64

[8] BK Dkt. #66

[9] BK Dkt. #68.

[10] The Court has previously ruled that this is not a defense to a §727 complaint.  Adv. Dkt. ##228, 251, 252

[11] Adv. Dkt. ##131, 133.

[12] Since there is no indication that Peter Anderson, the United States Trustee, personally participated in this bankruptcy case or the adversary proceeding which was brought in his name, the Court uses the designation UST and OUST (Office of the United States Trustee) interchangeably.

[13] Adv. Dkt. ##244-254.

[14] Adv. Dkt. ## 221, 270.

1.      On May 25, 2010, Shoemaker filed a petition under chapter 7.  This included his schedules and statement of financial affairs ("SOFA").

2.      In item #7 of his SOFA, Shoemaker checked "none" as to gifts made within one year immediately preceding the commencement of the case.

3.      On Schedule B, item #20, Shoemaker listed "none" for his holdings or interests in and to "[c]ontingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy or trust."

4.      Schedule B contained an accounts receivable aging report totaling in excess of $1.2 million.

5.      George Curtis McFarland II married Shoemaker's paternal grandmother (then Dorothy Shoemaker) in 1982.  McFarland died on January 24, 2008.  Dorothy predeceased George.  At the time of their marriage, Dorothy had two adult daughters. [15] [Presumably the Defendant was the son of Dorothy's son.]

6.      On or about June 21, 2010, Shoemaker received a distribution of $23,516.83 from the George C. McFarland Trust II.[16]  This was almost a month after the Shoemaker Chapter 7 Case was filed and less than three weeks before his initial §341(a) meeting of creditors.

7.      At the July 6, 2010 §341(a) meeting of creditors, Shoemaker did not testify about or otherwise expressly communicate or acknowledge his receipt of the distribution from the McFarland Trust.[17]

8.      The §341(a) meeting was continued numerous times.  Sometimes the Debtor appeared, sometimes Brownstein or an appearance attorney was present.  Although not specified, the Court is aware that at times §341(a) meetings are continued with no appearance by or on behalf of the debtor since the trustee is in the process of obtaining documents or discussing issues outside of that milieu.  Thus it is likely that some of the continued examinations were a mere formality.

---

[15] JPS ¶ N
[16] JPS ¶ I
[17] JPS ¶ I

9.   At the August 5, 2010 §341(a) meeting, Shoemaker provided the Trustee with a full box of 5,000-10,000 pages of documents related to his personal bankruptcy case as well as the AFL bankruptcy case.  Per the testimony of William Brownstein, these appear to have been given to Brownstein, whose office scanned them and sent the scanned documents to the Trustee.[18]

10.   Siegel did not try to coordinate with the trustee for AFL.  He was only interested in any value of AFL that might inure to Shoemaker personally since AFL was a separate estate.[19]

11.   On November 5, 2010, the OUST sent Brownstein a letter requesting that Shoemaker provide copies of all bank, credit union, and brokerage account statements for Shoemaker as well as an explanation and supporting documents for matters in the AFL bank accounts.[20]  Siegel does not recall whether he was aware of this request for information.

12.   Additional documents were produced over time in response to requests by the Trustee and the United States Trustee.  Included in the response to the UST were copies of bank statements for Citibank Account number ending 0665 (from April 1, 2010 to and through January 2, 2011) and a "Wire Transfer Detail" for a June 21, 2010 incoming wire of $23,516.83 from the McFarland Trust into that Citibank Account.[21]

13.   Not all of the requested bank statements were provided.  Some may have been in a storage facility and although Shoemaker waived privilege and provided a letter of authorization, the Trustee could not gain access from the facility owner because there was a delinquency of over $3,000 and the Estate did not have any funds to pay that.[22]  According to the Trustee, this is not an issue of whether Shoemaker was or was not cooperating.[23]  Later Attorney Bret Lewis obtained access to one of the storage units,

---

[18] Direct examination of William Brownstein, 10/10/17
[19] Cross-examination of Alfred Siegel, 10/10/17
[20] Ex. 305
[21] JPS ¶¶ K, L, M
[22] Direct testimony of Alfred Siegel, 10/10/17
[23] Cross-examination of Alfred Siegel, 10/10/17

but Siegel does not know what documents it contained.  No access was ever obtained to the other storage unit.[24]  The Trustee believes that the balance owing on the storage unit was due from AFL or another of the Debtor's business entities.[25]

14.     On January 5, 2011, Shoemaker filed his amended List of Creditors, as well as his amended Summary of Schedules and amended Schedules F and H.[26]

15.     At the continued §341(a) meeting on February 23, 2011, Shoemaker testified that a $2,120.63 purchase of jewelry on October 6, 2009 was a birthday present for his ex-girlfriend Caroline Violan. He also testified that he did not list a $5,000 "loan" to Ms. Violan on his Schedule B.  He confirmed that he received the $23,516.83 distribution from the McFarland Trust and that on June 30. 2010 [one week before the initial §341(a)] he personally withdrew the lump sum of $20,000 in cash from this Citibank Account.  All of these statements were in response to questions from Hatty Yip, a trial attorney in the OUST.[27]  Siegel does not recall if he asked Shoemaker to turn over the $20,000, but knows that it was never turned over.[28]  Shoemaker claimed the money as exempt and Siegel did not object to the exemptions.[29]

16.     On June 20, 2012, Defendant filed his amended Summary of Schedules, amended Schedules A, B, C, and F, and his amended SOFA.  He did this pro se.  The amended schedules increased the gross amount of his personal property assets from $485,827 to $12,290,946.70.  Among the items which constituted the increase were the value of Shoemaker's ownership interest in AFL from $0 to $400,000 and the amount of accounts receivable from $462,727.36 to $1,614,774.17.  Defendant also disclosed $10,163,658.58 in additional "[o]ther contingent and unliquidated claims of every nature" in item 21 of amended Schedule B.[30]

---

[24] Re-direct testimony of Alfred Siegel, 10/10/17
[25] Trial Declaration of Chapter 7 Trustee Alfred H. Siegel, ¶ 13 (dkt. #268)
[26] BK Dkt. #39.
[27] JPS ¶¶ S, T, U, V
[28] Direct testimony of Alfred Siegel, 10/10/17
[29] Re-cross examination of Alfred Siegel, 10/10/17
[30] JPS ¶¶ BB, CC, DD (BK Dkt. #64)

17.     Included in the list of "other contingent and unliquidated claims" in the June 20, 2012 amended Schedule B was a $5,000 "loan to Caroline Violan" and the following:[31]

a.      Against Rutan & Tucker for overbilling of attorney fees and cost = $128,000+;

b.      Against David Bennett, etc. for misappropriation, unfair competition, conversion of the business model of AFL = $4,000,000;

c.      Against Archer Entertainment, etc. for conversion and cancellation of stock = $1,250,000;

d.      Against Nguyen Nguyen for 48% gross recovery in litigation case against Orange County Sanitation District = $1,750,000;

e.      Against Jantha Harris for 48% recovery in litigation case against Lynwood Unified School District = $1,500,000;

f.      Against Todd Becker and Ngozi Usim for 48% recovery in litigation case against Lynwood Unified School District = $1,500,000;

g.      Against Todd Becker and Annette Mills for 48% recovery in litigation case against Lynwood Unified School District (no value listed); and

h.      Against Mina Montejano for attorney's fees from Montejano v. Samdrew = $30,000.

18.     After he received the amended June 20, 2012 schedules, Trustee Siegel hired special counsel to review the assets listed.  They determined that they had no value.[32]

19.     Prior to filing the amended schedules on June 20, 2012, Shoemaker and the Trustee had attempted to work out a compromise of the §727 complaint.  Although the Trustee was not a party to this complaint, he was a counter-defendant in a counter-claim brought by Shoemaker.[33]  Siegel suggested going forward to attempt to collect on

---

[31] For more detailed description of these claims see JPS ¶ EE and BK Dkt. #64.  Some of the numbers above are rounded.
[32] Cross-examination of Alfred Siegel, 10/10/17
[33] Adv. Dkt. #15

these newly revealed assets.  Shoemaker still had other potential cases on which to collect, but withheld these until he would see if Siegel intended to pursue assets of the estate and what needed to be further amended to pursue such litigation of potential assets of the estate.[34]

20.     According to Mr. Siegel, it is not uncommon for there to be amended schedules. Sometimes this is to modify assets listed based on new information.  When Shoemaker amended his schedules, Siegel's office investigated and Siegel made a business judgment – not that the statements were false, but that some of the assets listed might be worth proceeding against and some not.[35]

21.     Although not all of the contingency cases listed in paragraph 17 above were completed at the time that Shoemaker filed his Chapter 7 Case, all of the assets listed on the June 20, 2012 amended Schedule B were known to Shoemaker at the time that he filed this bankruptcy case.  They were claims for fees or causes of action that arose while he was a practicing attorney.[36]  Within less than a week after he filed this bankruptcy case, he no longer was able to practice law.

22.     At some time after June 20, 2012, Shoemaker provided a list of former clients who, he contended, owed him fees.  This list also included other assets that he believed were owed to him as a result of his legal practice or involvement with AFL.  Shoemaker and Siegel agreed that Siegel would attempt to collect on these asserted assets and that Shoemaker would cooperate in that collection.  Shoemaker asserted that there could be sufficient collection to pay all of his creditors and therefore this adversary proceeding would be dismissed.

23.     Siegel hired Bret D. Lewis as counsel to pursue assets listed in the June 20, 2012 schedules and other claims that Shoemaker later told him he possessed.  On May 9, 2014, Lewis filed the adversary proceeding of Siegel v. Lee, et. al, 1:14-ap-01207

---

[34] JPS ¶ FF
[35] Re-cross examination of Alfred Siegel, 10/10/17
[36] See for example, Shoemaker declaration and attachments thereto in Adv. #1:14-ap-01218-GM, dkt. 16 and Adv. 1:14-ap-01239, dkt. 17-3.

(originally filed in the Los Angeles Division as 2:14-10 ap-01314).  This named

approximately 37 defendants, most of whom had no relationship to each other.  Judge

Donovan dismissed this adversary proceeding and it was replaced by a series of

adversary proceedings, each naming an individual defendant (jointly the "Collection

Cases").[37]

24.    Of the 29 adversary proceedings, the Trustee obtained a default judgment for

$5,000 against one defendant  (1:14-ap-1239).  All of the other adversary proceedings

were dismissed on a motion by the defendant, stipulation, or motion by the Trustee.

Based on the tentative rulings and courtroom discussion on these and other of the

Collection Cases, on August 31, 2015, Siegel filed motions to dismiss most of the

remaining adversary proceedings largely due to statute of limitations issues and/or lack

of evidence.[38]

25.    On September 8, 2015, Shoemaker filed amended Schedules B and C.[39]

26.    Of the amended schedules that were filed, Brownstein's firm prepared only the

first set, which were filed on January 5, 2012.

27.    Brownstein sent 5,000-10,000 pieces of information to the OUST.  His assistant

had received these from Shoemaker's assistant.  He did not review all of these.  They

were scanned in.  Brownstein does not know if he got anything that Shoemaker may

have had concerning the handbag and accessories business started by his girlfriend

and he does not recall seeing such a document.  However, Brownstein speculates that

it could have been caught in the scanner.  Similarly concerning the home repairs on the

Lake Elsinore property.  Also he does not remember receiving anything about the Trust

other than what he provided to the OUST.[40]

---

[37] 1:14-ap-01210 through 1:14-ap-01239
[38] See, for example, the tentative rulings of 9/1/15 at 10:00 a.m. on 1:14-ap-1235 (Fernando Mancilla), 1:14-ap-1225 (Thuy Nguyen)
[39] BK Dkt. #154
[40] Direct examination of William Brownstein, 10/10/17

28.    Brownstein's testimony was not always clear and in many instances he had little or no recollection concerning the Trust.  But at times he was adamant that he did not give Shoemaker specific advice.  Because Shoemaker did not testify, there was no admissible evidence supporting an argument that he relied on Brownstein's advice to not disclose the existence of the Trust in the initial schedules or at the initial §341(a) hearing.  There also was no admissible evidence that Brownstein advised Shoemaker that he could use $20,000 of the Trust money that he received.  The testimony of Brownstein is as follows:

a.    At his deposition on November 1, 2016, Brownstein did not recall whether – during the period between June 21, 2010 and July 1, 2010 - he received any information that there was a Trust.  However, he does believe that he advised Shoemaker that receiving funds post-petition "under certain circumstances were or were not property of the estate."[41]  But at his deposition in December 2016, his recollection was refreshed and he testified mentioning to Shoemaker that "if there was a distribution post bankruptcy we should amend the schedules and include it.  That was for him to decide, and I think he said it was wasn't [sic].  It was basically in the form of – may have been or may not have been, and I don't recall ever hearing anything further is my recollection now."  When asked whether Brownstein ever advised Shoemaker that "this was definitively not part of the estate," he responded: "No, I did not advise him of that."[42]

b.    Although the timing is not clear, it appears that Brownstein did not include the Trust in the schedules or the amended schedule that he prepared because at that time he did not know that Shoemaker had an interest in the Trust or that he had received money from the Trust.  Brownstein first became aware of the Trust at the February 23, 2011 §341(a) examination.  He doesn't recall what he advised Shoemaker to do, but his usual procedure would be to tell a debtor to

---

[41] Ex. 14, p. 72. (Deposition of William Brownstein, 11/1/16)
[42] Ex. 15, p. 211 (Deposition of William Brownstein, 12/6/16)

disclose it on an amended schedule.  However, because Shoemaker was an attorney, Brownstein would have allowed it to be Shoemaker's decision whether or not to file amended schedules.[43]

c.      Brownstein may have told Shoemaker that he was free to spend the Trust money, but he does not recall saying that.  In fact, he does not recall even knowing about that money prior to the §341(a).  As is his general practice, he believes that he advised Shoemaker to make full and complete disclosure of all of his financial circumstances and he did not advise him to leave off assets or potential assets from his schedules.  The issue of the Fifth Amendment did not arise in this case.  But he did not advise him to list potential lawsuits and litigation (as opposed to those in existence).[44]

d.      At Brownstein's request, Shoemaker completed the Client Information Worksheet.[45]  Brownstein uses this as a basis to fill out the petition and schedules.  Brownstein may have deemed this chapter 7 case to be an emergency filing because Shoemaker was threatening him because the prior chapter 13 was dismissed.  Thus, Shoemaker would have been told that he could amend the schedules.

e.      Brownstein is adamant that if things were left off of the schedules, it was not because Brownstein advised Shoemaker to leave them off.[46]

//

//

//

---

[43] Direct examination of William Brownstein 10/10/17
[44] Direct examination of William Brownstein 10/10/17
[45] Ex. 13.  There is no evidence as to when this was completed and whether it was for the initial chapter 13 case or for this chapter 7 case.
[46] Direct examination of William Brownstein 10/10/17

1

## CONCLUSIONS OF LAW

2

The Plaintiff has the burden of proving the objection under §727(a).[47]  This is to

3

be done through a preponderance of the evidence.

4

> Those objecting to discharge "bear[ ] the burden of proving by a preponderance
> of the evidence that [the debtor's] discharge should be denied." *Khalil v.*
> *Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir.
> 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's
> statement of applicable law). "In keeping with the 'fresh start' purposes behind
> the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors
> and strictly against parties objecting to discharge." *Bernard v. Sheaffer (In re*
> *Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996). This does not alter the burden on
> the objector, but rather means that "actual, rather than constructive, intent is
> required" on the part of the debtor. *In re Khalil*, 379 B.R. at 172.

5

6

7

8

9

10

*Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)

11

12

## 11 U.S.C. §727(a)(2)

13

> 11 U.S.C. §727(a):  The court shall grant the debtor a discharge, unless —
> (2)  the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
> the estate charged with custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
> removed, destroyed, mutilated, or concealed--(A)  property of the debtor, within
> one year before the date of the filing of the petition; or
> (B)  property of the estate, after the date of the filing of the petition.

14

15

16

17

18

"A party seeking denial of discharge under § 727(a)(2) must prove two things:

19

'(1) a disposition of property, such as transfer or concealment, and (2) a subjective

20

intent on the debtor's part to hinder, delay or defraud a creditor through the act [of]

21

disposing of the property.'"  *Retz*, 606 F.3d at 1199 citing *Hughes v. Lawson (In re*

22

*Lawson),* 122 F. 3d 1237, 1240 (9th Cir. 1997).

23

The Ninth Circuit went on to state that a "debtor's intent need not be fraudulent to

24

meet the requirements of § 727(a)(2).  Because the language of the statute is in the

25

disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor.  *Retz,* 606

26

F.3d at 1200;  citing *Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1281 (9th Cir.

27

1996).  Furthermore, lack of injury to creditors is irrelevant for purposes of denying a

28

---

[47] Fed. R. Bankr. P. 4005

discharge in bankruptcy." *Id.*

The Plaintiff asserts that until the filing of Defendant's amended Schedule B, which was more than two years after the commencement of the case, Defendant concealed the existence of at least eight personal property assets that he valued at over $10 million.  The Plaintiff also contends that Shoemaker concealed his interest in the McFarland Trust by excluding it in his initial and amended schedules and, further, that he concealed his receipt of $23,516.83 from that trust, which occurred between the date that the bankruptcy was filed and the date for the first §341(a) meeting.  The Plaintiff argues that this was with the intent to hinder, delay, or defraud the Trustee.  Beyond that, immediately after receipt of the money, Shoemaker used $20,000, which has never been turned over to the Trustee.

<u>11 U.S.C. §727(a)(2)(A)</u>

Section 727(a)(2)(A) concerns transfer, removal, destruction, mutilation, or concealment of property <u>of the debtor</u> within one year before the date of the filing of the petition.  Reviewing the issues raised by the OUST, the property of the debtor that existed prior to his filing, but was not included in his initial schedules, consisted of a "loan" of $5,000 that he made to his former girlfriend[48] and a substantial increase in his assertion that his ownership interest in AFL was actually $400,000 rather than the $0 initially reported.  Later he also increased his claimed accounts receivables from $462,000+ to over $1.6 million and disclosed "other contingent and unliquidated claims" that included a series of causes of action for potential contingent attorney's fees against former clients and a $4 million claim against David Bennett for conversion of the business model of AFL.

The relevant dates are as follows:

May 25, 2010 – petition and schedules filed

---

[48] There is also mention of an interest in a business of Ms. Violan, but no evidence has been presented as to the existence of this "asset."

July 6, 2010 – initial §341(a) meeting

November 5, 2010 – OUST sent Brownstein a request for copies of bank, etc. statements

February 23, 2011 – Shoemaker testified at the §341(a) as to the gift to Violan and his "loan" to her

April 8, 2011 – OUST filed this adversary complaint to seek denial of discharge

Prior to June 20, 2012, Shoemaker and the Trustee attempted to work out a compromise of the §727 complaint

June 14, 2012 – Trial date for UST v. Shoemaker.  This is continued at the request of the OUST

June 20, 2012 – Amended schedule B filed revealing the enhanced personal property assets from $485,000+ to $12+ million.

There is no evidence why Shoemaker omitted these assets prior to the June 20, 2012 amended schedule B.  However, the June 20, 2012 disclosure was clearly for purposes of a potential benefit to Shoemaker who, even in June 2012, knowingly and intentionally did not make full disclosure of his assets.  As he agreed in the JPS:

> The amended schedules filed on June 20, 2012 were a baseline of potential litigation matters proposed by Defendant to Siegel and Plaintiff as a compromise. At the time of the June 14, 2012 hearing, trial was schedule between Plaintiff [OUST] and Defendant as primary parties and between Defendant and Siegel on a counter-claim by Defendant.  The amended schedules on June 20, 2012 were in response to Siegel's suggestion and direction.  It was always Defendant's understanding that that [sic] there might be additional litigation matters as the parties worked towards developing the totality of the potential cases.  It was Defendant's understanding that the June 20, 2012 schedules were never intended to be the full extent of the potential litigation cases since Defendant was uncertain of the full extent that Siegel intended to pursue assets into the estate. At all times, Defendant was ready, willing and able to further amend the schedules as it became necessary.[49]

It is clear that Shoemaker knew of these assets before the bankruptcy case was

---

[49] JPS ¶ FF

filed.  Except for the gift and loan to Ms. Violan, they all arose out of his practice of law, which terminated with his May 31, 2010 suspension by the state bar.  Almost all were for fees owed for work done prior to that time.  Shoemaker clearly knew that they existed and intentionally omitted them from his initial schedules, his disclosures at the various §341(a) meetings, and his amended schedules.  He only revealed them when he thought that he could receive a benefit from their collection on behalf of the estate.  And even then he held back on at least twenty or more alleged assets, which later constituted the bulk of the Collection Cases.

While the actual value of these Collection Cases is unknown – largely because the statute of limitations had run before they were filed some four years after the bankruptcy case began – that is not the test of whether a debtor concealed his property.  In at least one of the Collection Cases there was a default judgment for $5,000 and there may have been many more had he carried out his duty as a debtor and disclosed them in his initial schedules.

To be actionable, the omission must be material.  While the value of the omitted asset is not dispositive, its omission is material if it detrimentally affects the administration of the estate. *In re Wills*, 243 B.R. 58, 62 (9th Cir. BAP 1989)

In this case, the omission of the assets underlying the Collection Cases is clearly material.  At least some arose from a substantial settlement in state court litigation which had been commenced by Shoemaker under a contingency agreement.  Had he revealed these at the beginning of the Chapter 7 Case – as he was required to do – the Trustee would have had a meaningful opportunity to pursue collection.  Shoemaker himself believed that these had substantial value.  And while he blames the Trustee for delaying the filing of the adversary proceedings for the Collection Cases, it was Shoemaker himself who allowed the statute of limitations to run by hiding these for some two years after he filed this Chapter 7 case.

The Court can only surmise as to his reason for concealment.  Shoemaker is an attorney and must have known that he could not personally collect on these claims.

Perhaps he hoped that the Trustee would abandon them to him, but perhaps not.  His reasoning is not dispositive since his actions demonstrate his knowledge of these assets, his knowing failure to reveal them, and his intent to hinder the Trustee or at least delay him in pursuing property of the estate.  Based on the evidence and the inferences drawn from his course of conduct, it is clear that – except as to the loan and gift to Ms. Violan - Shoemaker intentionally concealed this property of the estate and thus violated §727(a)(2)(A).  *In re Devers*, 759 F.2d 751 (9th Cir. 1985).

The issues concerning Ms. Violan are less clear and the Court need not make a ruling on them, given the concealment of the assets resulting in the Collection Cases.

The Court finds the OUST has proven each element of Section 727(a)(2)(A) so as to warrant denial of the discharge.

## 11 U.S.C. §727(a)(2)(B)

Section 727(a)(2)(B) deals with property of the estate after the date of filing of the petition.  The Trust proceeds fall into this category.

To deny Shoemaker's discharge under Section 727(a)(2)(B), the Court must find that Shoemaker's failure to disclose the Trust was with actual intent to hinder, delay, or defraud.  *Phillips v. United States Trustee (In re Phillips),* 2010 WL 6259975, *10 (9th Cir. BAP April 6, 2010).  Constructive fraudulent intent cannot be the basis for denial of discharge.  *Id.*  Intent may be established by circumstantial evidence or by inferences drawn from the debtor's course of conduct.  *Id.*

Although Shoemaker has established that George McFarland was not a blood relative and thus has inferred that he had no knowledge of the inheritance prior to its receipt, inference does not take the place of actual evidence.  However, the Plaintiff is the one who has the burden of proof.  The only evidence that it has offered is the fact that Shoemaker received the distribution from the Trust via direct deposit into his bank account.[50]  From this the OUST infers that the person who made the distribution

---

[50] JPS ¶ M

obtained Shoemaker's checking account information in order to send this testamentary

bequest to him.  However, the money was transferred almost a month after the

bankruptcy case was filed and the Court does not find that this constitutes evidence that

Shoemaker knew of his inheritance prior to the filing of the bankruptcy case.  No other

evidence supporting prior knowledge has been presented.

There is no doubt that Shoemaker immediately became aware on receipt of the

money since he withdrew it shortly thereafter.  At that time the money was not

automatically exempt. There is legal uncertainty whether exempt property can trigger

this section (is it "property of the estate" prior to being deemed exempt under §522(l)?).

To the extent that there is any law on this issue, it seems that the underlying question is

whether knowledge of the exempt property could have led to other assets or otherwise

detrimentally affected the administration of the estate. See *Wills*, 243 B.R. at 63.

But in this case the Court need not struggle with this as to the Trust.  The OUST

has not shown that Shoemaker knew of his potential inheritance until he received it or

that he had the intent to conceal it once it came into his possession.  The mere fact that

he immediately withdrew most of the money is no shock since he had lost his legal

license and appears to have had no other source of income.  That he never turned it

over to the Trustee is not an issue since there is no evidence that the Trustee ever

asked for it and, eventually, it was deemed to be exempt.[51]

The OUST claims that had Shoemaker provided full and complete disclosure of

his assets from the start of the case, the Trustee's administration would have been

conducted differently.  This is clearly correct as to the prepetition litigation claims (as

discussed elsewhere).  But not as to the Trust.  For instance, the OUST argues that with

prompt, accurate information from Shoemaker, the Trustee could have immediately

decided whether the proceeds should have been returned to the Estate and how the

trust funds should be distributed.  Yet, even when the Trustee was aware of the funds

---

[51] The Court is aware that had it not been exempt, this could have provided the Estate with sufficient money to pay the storage fees and those documents might have led to other assets.  But, it was exempt!

and was aware of Shoemaker's Amended Schedule C claiming the trust funds as

exempt, the Trustee did not object to the exemption.  Moreover, while an omission on a

schedule can be a concealment for purposes of Section 727(a)(2)(B), the Court finds

that the OUST has not set forth sufficient evidence to demonstrate the requisite intent

on the part of the Debtor that he intended to conceal the Trust proceeds.  Therefore, the

Court finds that the OUST has not proven each element of Section 727(a)(2)(B) so as to

warrant denial of the discharge.


### 11 U.S.C. §727(a)(3)

11 U.S.C. §727(a):  The court shall grant the debtor a discharge, unless —
(3)  the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
preserve any recorded information, including books, documents, records, and
papers, from which the debtor's financial condition or business transactions might
be ascertained, unless such act or failure to act was justified under all of the
circumstances of the case.


Section 727(a)(3) places an affirmative duty on the debtor to keep and preserve

records accurately documenting his or her business and personal affairs.    Requiring

accurate documentation "removes the risk to creditors of 'the withholding or

concealment of assets by the bankrupt under cover of a chaotic or incomplete set of

books or records.' "   This exception to discharge is strictly construed in favor of the

debtor's fresh start. *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva),*

550 F.3d 755, 761 (9th Cir. 2008).

The 9th Circuit Bankruptcy Appellate Panel has summarized the law on this point:

To succeed on its objection to discharge under § 727(a)(3), Trustee must
show " '(1) that [Chen] failed to maintain and preserve adequate records, and (2)
that such failure rendered it impossible to ascertain [Chen's] financial condition
and material business transactions.' " *Lansdowne v. Cox (In re Cox)*, 41 F.3d
1294, 1296 (9th Cir. 1994) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232
(3d Cir. 1992)). Generally, records are sufficient if they allow the court and
creditors to trace the debtor's financial dealings. *In re Ridley*, 115 B.R. 731, 733
(Bankr. D. Mass. 1990).
Once Trustee met her initial burden showing these elements, the burden
of proof then shifted to Chen to justify the inadequacy or nonexistence of the
records. *In re Caneva*, 550 F.3d at 761. The issue of justification is decided

under an objective standard and depends on what a normal, reasonable person would do under similar circumstances. *Id.* at 763 " 'Justification for [a] bankrupt's failure to keep or preserve books or records will depend on ... whether others in like circumstances would ordinarily keep them.' ").

*Chen v. U.S. Trustee (In re Chen)*, 2017 WL 4768104, *6 (9th Cir. BAP October 17, 2017).

Shoemaker turned over some records in a timely fashion.  Some he turned over after a request from the OUST, which was made about six months into the case. Others were in a storage facility and while he eventually waived privilege and gave permission for the Trustee to obtain those documents, the Trustee was prevented due to an outstanding storage fee of $3,000.

The OUST focuses on some specific personal records that were never turned over. The OUST argues that Debtor failed to produce accurate and complete records at the start of the case showing, among other things (1) the disposition of the trust funds that were withdrawn; (2) the disposition of the $5,000 loan to his then girlfriend in September 2009, approximately five months prior to the bankruptcy filing; (3) the source of the $13,382.25 deposited into his personal bank account approximately six months prior to the bankruptcy filing; or (4) the details on monies paid in connection with home repairs approximately five months prior to the bankruptcy filing.

Looking at the sums involved, these are not really the type of payments for which a reasonable person in like circumstances would keep records.  For example, check #1005 for $2,500 that was given to a handyman for work on the Lake Elsinore property, check #1013 for $2,238.25 for materials for the roof repair on the Lake Elsinore property, or a purchase of jewelry for $2,120.63 that was given as a gift to his girlfriend. As to the use of the $20,000 that Shoemaker withdrew from the Trust proceeds, he explains that part was used for a business consultant and the balance was for living expenses.[52]

These items are relatively small. Given their nature, it is unlikely that they might

---

[52] Defendant's ex. 313, letter from Shoemaker to Yip, p. 0592

have led to undisclosed assets.

The other issue concerns the records in storage. It appears that the bin contained business records of Shoemaker's various enterprises and legal practice. And, of course, the AFL Trustee had some or all of the AFL documents.

The OUST makes much of the fact that Shoemaker quite possibly concealed an unknown amount of financial records by placing them in storage and not paying the resulting storage facility fees. However, the OUST has not offered any testimony to show how it attempted to gain access to these documents, i.e. making a request of the Trustee to actively pursue the retrieval of these documents by way of paying the fees or using a subpoena. Also, it should be noted that Shoemaker signed a waiver authorizing the Trustee to gain admittance to his storage facility and review the documents. Thus there is no evidence that Shoemaker failed to cooperate with the Trustee as to reviewing the records that he had.

Siegel testified that he did not have money in the estate to pay this fee and therefore the content of those boxes is still unknown. Siegel seems to agree that a debtor has no responsibility to pay the storage fees so that the Trustee (or anyone else) can gain access.[53] In fact, because Shoemaker provided the Trustee with the key and waiver, he constructively turned over all of the known records.[54] This is enough.

Here, while Plaintiff and Shoemaker were involved in discovery disputes concerning the production of documents and responses to interrogatories, the OUST's evidence does not establish that Shoemaker failed to maintain adequate records and that such failure made it impossible for the Trustee to ascertain Debtor's financial condition. Shoemaker did provide the OUST with numerous documents which included bank statements detailing the wire transfer of the trust fund monies.

---

[53] Trial testimony of Alfred Siegel

[54] Though there is no case exactly on point, *Steve C. Block, Trustee v. Marilyn M. Moss (In re Moss)*, 258 B.R. 391, 404 (Bankr. W.D. Missouri 2011) indicates that it is sufficient if there is a constructive rather than an actual turnover.

Based on the numerous records eventually turned over by Shoemaker and the OUST's failure to provide sufficient evidence that Shoemaker's records were inadequate, the Court cannot find that the OUST has satisfied the first element under *Chen* and *Cox* that Shoemaker failed to maintain and preserve adequate business records.  Since the OUST has the burden of proof under Section 727(a)(3) which is strictly construed against it as the party objecting to discharge, the Court finds the OUST has not proven each element of Section 727(a)(3) so as to warrant denial of the discharge.

## 11 U.S.C. §727(a)(4)(A)

11 U.S.C. §727(a):  The court shall grant the debtor a discharge, unless —
(4)  the debtor knowingly and fraudulently, in or in connection with the case
(A)  made a false oath or account.

A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath.  See *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (9th Cir. BAP 2004)]*; Roberts v. Erhard (In re Roberts),* 331 B.R. 876, 882 (9th Cir. BAP 2005), aff'd, 241 Fed. Appx. 420, 2007 WL 2089041 (9th Cir.). "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (citing *Aubrey v. Thomas (In re Aubrey),* 111 B.R. 268, 274 (9th Cir. BAP 1990)). That said, a false statement or omission that has no impact on a bankruptcy case is not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A). *Id.*
DSI must show by a preponderance of the evidence that: (1) Debtor made such a false statement or omission, (2) regarding a material fact, and (3) did so knowingly and fraudulently. See *Searles*, 317 B.R. at 377; *Roberts*, 331 B.R. at 882 (same test, broken down into four elements).
*Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009)

The OUST asserts that Shoemaker gave a false oath as to these items: (1) his lack of prepetition knowledge of the inheritance, which is discussed above under §727(a)(2); (2) his initial failure to disclose all potential litigation claims, which he only did some eighteen months later and then it was only in a piecemeal fashion; and (3) a

1    $5,000 gift or loan to Shoemaker's ex-girlfriend, apparently to start a handbag and

2    accessories business.  There is also some question about whether Shoemaker had an

3    interest in the business that she started, but no evidence has been offered to show that

4    he did.

5

6    Finally, to deny a discharge under § 727(a)(4)(A), the trial court must also find
7    that the false oath was made "fraudulently".  The fraud provision of § 727(a)(4) is
     similar to common law fraud, which the Ninth Circuit has described as follows:
8        The creditor must show that (1) the debtor made the representations; (2)
         that at the time he knew they were false; (3) that he made them with the
9        intention and purpose of deceiving the creditors; (4) that the creditors
         relied on such representations; (5) that the creditors sustained loss and
10       damage as the proximate result of the representations having been made.
     *Anastas v. American Savs. Bank (In re Anastas),* 94 F.3d 1280, 1284 (9th
11   Cir.1996), quoting *Britton v. Price (In re Britton),* 950 F.2d 602, 604 (construing
     fraud provision of § 523(a)(2)(A)).
12

13   The elements of common law fraud substantially overlap the elements of a claim
14   under § 727(a)(4)(A).  The first two elements of a fraud cause of action duplicate
     the first element described above.  For the purposes of § 727(a)(4), materiality
15   replaces the elements of reliance and proximately caused damage in a fraud
     cause of action.
16

17   The intent required for finding that the debtor has acted fraudulently under §
     727(a)(4)(A) with respect to a false oath must be actual intent: constructive
18   fraudulent intent cannot be the basis for the denial of a discharge. See *Devers v.
     Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753 (9th Cir.1985).
19

20   A debtor's fraudulent intent may be established by circumstantial evidence or by
     inferences drawn from his or her course of conduct. See *e.g.*, *id*. at 753–54;
21   *Wills*, 243 B.R. at 64; *Hoblitzell*, 223 B.R. at 215.  The requisite intent may be
     found from the surrounding circumstances.
22   *In re Roberts*, 331 B.R. 876, 884–85 (B.A.P. 9th Cir. 2005), aff'd and remanded, 241 F.
     App'x 420 (9th Cir. 2007)
23

24       The first element that must be proven to deny discharge under Section

25   727(a)(4)(A) is the existence of a false oath in connection with the bankruptcy case.

26   *Retz*, 606 F.3d at 1197.  Here, except as to the inheritance, Shoemaker clearly omitted

27   the above-mentioned items on his original Schedules and Statement of Financial

28   Affairs.  There is no question he signed his Schedules and SOFA under penalty of

perjury.  He also indicated that he was not aware, at the time, of any errors or omissions in any of his schedules.  Shoemaker amended his Schedules more than once over the course of the pending bankruptcy.  He has agreed that the June 20, 2012 Amended Schedules included a partial list of potential litigation matters that he proposed to Trustee Siegel and Plaintiff as a compromise.[55]

While, as discussed under §727(a)(2) above, the evidence concerning the omission of the gift and/or loan to Ms. Violan and the inheritance do not arise to a sufficient level to show an intent to hide assets, the failure to list any (initially) and all (in June 2012) of the potential litigation assets was clearly a knowing and fraudulent omission.  Shoemaker knew of the existence of these assets that he later valued at over $10 million.  He knew that the schedules were not true and correct, but each time he signed his schedules he swore under penalty of perjury that they were true and correct. He intended the Trustee and his creditors to rely on what was contained (and not contained) in those Schedules.  And the Trustee did rely on what he filed during at least the first eighteen months of the case.  While Shoemaker faults the Trustee for delaying litigation from June 2012 - when Shoemaker first revealed some of his "hidden" assets - until May 2014 when the Trustee filed the initial adversary proceeding to collect, it is clear that the Trustee and the Estate suffered a detriment from Shoemaker's initial delay.  Many of the Collection Cases were dismissed due to the statute of limitations, which had been substantially shortened because of the eighteen month delay that occurred due to Shoemaker's concealment,  It is unknown what the result in each case would have been if the Collection Cases had been filed eighteen months sooner.  These facts meet the requirements to find fraud.

The second element required in a Section 727(a)(4)(A) finding is that the omission must be regarding a material fact.  A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property."  *Khalil,* 379

---

[55] Defendant's closing brief, p. 7; JPS ¶ FF

B.R. at 173.  Furthermore, an omission or misstatement that "detrimentally affects administration of the estate" is material.  *Retz,* 606 F.3d at 1198.

According to the OUST, Shoemaker's various omissions relate to property of the estate and the disposition of this property.  The Court finds that the omissions as to the Trust inheritance (which ultimately was exempt) and the loan/gift to Ms. Violan (totaling some $7,000) had no resulting impact on the administration of the case.  However, it is a different story as to the litigation claims.  Although the Trustee initially determined that they had no value to the estate, this concerned only those which had been revealed on the June 20, 2012 schedule B.  There were many more, which made up the bulk of the Collection Cases.  And although the Trustee did not seem to have much faith in recovering substantial sums from the Collection Cases, he found attorney Bret Lewis who – after consultation with Shoemaker and analysis of the actions – was willing to take the Collection Cases on a contingency fee basis, thus investing his time in pursuing these matters.  The Court cannot find that either Mr. Siegel or Mr. Lewis acted in bad faith in bringing all or most of the Collection Cases.  And had Shoemaker timely and completely revealed these, they may have had substantial value.  Thus the requirement for materiality is met.

As discussed above, the Court clearly finds fraudulent intent by Shoemaker in withholding disclosure of the accounts receivable and other assets which later formed the basis of the Collection Cases.

The Court finds that the OUST has proven each element of Section 727(a)(4)(A) so as to warrant denial of the discharge

### 11 U.S.C. §727(a)(4)(D)

11 U.S.C. §727(a):  The court shall grant the debtor a discharge, unless —
(4)  the debtor knowingly and fraudulently, in or in connection with the case
(D)  withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

Section 727(a)(3) covers the failure to maintain records.  Section §727(a)(4)(B) concerns records that actually exist, but have been knowingly or fraudulently withheld by the debtor.  The discussion above concerning §727(a)(3) touches on this.  In summary, there is no evidence that Shoemaker had documents that he withheld.  The existence of the box(es) in storage vitiates a claim that he did not keep records (§727(a)(3)) and his cooperation in turning over the key and signing the waiver shows that he did not withhold access from the Trustee.

The Court finds the OUST has not proven each element of Section 727(a)(4)(D) so as to warrant denial of the discharge.

## **Affirmative Defenses**

Since the Court finds for the Plaintiff as to §727(a)(2)(A) and §727(a)(4)(A), the burden shifts to the Defendant to show that he has one or more affirmative defenses.  Per the JTS, Shoemaker has asserted six groups of affirmative defenses.  He also asserts an additional defense in his Closing Brief.[56] There he contends that an amendment to the schedules relates back fo the originals.  While this is true as to certain things, it does not excuse a debtor from full disclosure at the time of his initial schedules and SOFA.  Shoemaker has the burden of proof on each.[57]

<u>1, 3, 8, 18, 19</u> – Failure to allege legally sufficient facts to state of claim under §727. This is dealt with above and is not an affirmative defense, but is the Plaintiff's burden that must be met.  Plaintiff has failed to meet it as to §727(a)(2)(B), §727(a)(3), and §727(a)(4)(D).

<u>5, 10, 20, 21</u> – Good faith reliance upon advice of counsel (Brownstein).  This would

---

[56] Adv. Dkt. #275, p. 25
[57] A defendant bears the burden of proof on its affirmative defenses.  *Hernandez v. Dutch Goose, Inc.,* 2013 WL 5781476, *2 (N.D. Cal. October 25, 2013); *citing Kanne v. Connecticut General Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir. 1988).

remove the intent requirement.  There is no evidence that Brownstein gave Shoemaker advice to (1) not reveal the Trust before or after distribution, (2) distribute the $20,000 to himself, (3) not schedule the loan that he made to his girlfriend, and (4) not include all of his litigation assets in the initial or later schedules.  At best, Brownstein testified that he has no memory of giving such advice.  But he further testified that he would not have given that advice.  To the extent that he told Shoemaker that some post-petition receipts are not property of the estate, Brownstein was not given the specific facts of their receipt and he left it to Shoemaker, an attorney, to investigate for himself.  Shoemaker did not testify at trial and thus there is no evidence that he received advice from Brownstein that caused him to fail to disclose these assets.  In fact, Brownstein was adamant that he was not aware of the Trust until the February 23, 2011 §341(a) examination, which was some nine months after the petition was filed and eight months after Shoemaker received the money.  It was also after the initial amended schedules were filed on January 5, 2011.  Brownstein also testified that he did not advise Shoemaker to leave off assets; however he did not specifically advise him to list potential lawsuits and litigation.  Because Shoemaker is an attorney, it is not credible that he could have believed that his potential lawsuits were not assets.  And his action in hiding them and using them only to try to settle with the Trustee clearly demonstrates his intent not to disclose unless there would be a benefit to him to do so. Therefore the Court finds that good faith reliance upon advice of counsel is not an affirmative defense in this case.

7, 11, 24, 25 – Unclean hands of Plaintiff

No evidence has been proffered that the Plaintiff (the OUST) or the Trustee (Siegel) treated Shoemaker in any inequitable fashion.  Therefore the Court finds that unclean hands of the Plaintiff is not an affirmative defense in this case.

13 – Waiver as to §727(a)(3).

Although Shoemaker has prevailed under §727(a)(3), I will still analyze his

affirmative defenses as to that claim for relief.

1. Concerns the property at 32766 Brechtel, Lake Elsinore.

   Did Siegel waive this when he failed to oppose the RFS and failed to marshal the

   asset, thus abandoning it, including the pre-petition repairs paid for by

   Shoemaker?

Shoemaker seems to believe that just because the Trustee does not act to preserve

assets of the estate, a debtor is excused from carrying out his duties to timely reveal

these through his schedules and statement of affairs.  This is not the law.  The loss of

the Lake Elsinore property is simply not relevant to this adversary complaint.


2. Did the Plaintiff relinquish its §727(a)(3) cause of action as to any facts related to

   books, records, and the like due to Shoemaker's assignment of the Storage to

   Siegel and Siegel's knowledge of the Storage early in the bankruptcy

   proceedings

In this case, as noted above, the OUST has not carried its burden.  There were

certainly missing documents, but we do not know what is contained in the storage

boxes that were not opened.  It was not Shoemaker who refused turnover.  The storage

facility is the one that would not let the Trustee have the boxes without being paid some

$3,000.  Siegel testified that the estate did not have the money.  But he also felt that

Shoemaker was not required to spend his own money to get the documents released.

Shoemaker had waived any privilege and that appears to be enough.


14, 28, 29 – lack of materiality – issues: error or omission relates to an asset that is

property of the estate; such error or omission detrimentally affected the administration of

the estate; defendant took remedial action such as amending his schedules to correct

any such errors or omissions.

Clearly the failure to reveal the interest in the Trust and the receipt of the money

was a material omission.  While Shoemaker later provided this information (but only after the Trustee had seen his bank statements that showed the deposit and withdrawal), Shoemaker did not turn over the money.  Had the money not been claimed as exempt and the Trustee apparently agreed since he never objected, this failure may have had some effect.  But it was exempt and, further, the Trustee never requested turnover.

The information about the $5,000 loan to Shoemaker's girlfriend may have been material.  Given the lack of cash in this estate, even the recovery of such a relatively small amount of money could have paid for the boxes in storage.  At this point we do not know – and will never know – whether the documents in those boxes would have led to recovery of substantial assets.

However, the main omission of information concerned the litigation assets and – as discussed above – that was definitely material.

<u>15, 23</u> – equitable estoppel as to §727(a)(3) and §727(a)(4)(D) – deals with Shoemaker's cooperation with Siegel.

This largely concerns both the boxes in storage and Shoemaker's offer to assist in the series of lawsuits to recover fees and property allegedly owed to him by former clients and on former cases.  Because the Court is ruling in favor of Shoemaker as to §727(a)(3) and §727(a)(4)(D), no affirmative defense is needed or relevant.

//

//

//

//

//

//

//

//

## **CONCLUSION**

Judgment is granted to the Plaintiff under §727(a)(2)(A) and §727(a)(4)(A).

Judgment is granted to the Defendant under §727(a)(2)(B), §727(a)(3), and §727(a)(4)(D).

###

Date: January 4, 2018

Geraldine Mund
United States Bankruptcy Judge